IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 10-61636-crm |
| | ) | |
| SOUTHERN GOLF PARTNERS, LLC, | ) | CHAPTER 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### DECLARATION OF A. BOYD SIMPSON
### IN SUPPORT OF FIRST DAY MOTIONS

I, A. BOYD SIMPSON, being duly sworn, depose and state as follows:

1. On January 20, 2010, Southern Golf Partners, LLC, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and has continued in possession of its property and management of its business as debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

2. I am the Sole Manager of the Debtor. My duties for the Debtor include the general supervision of and responsibility for many aspects of the Debtor's day-to-day operations and business affairs. Among other things, I am significantly involved with the development and implementation of the Debtor's business plan and strategies and advise the Debtor with respect to its business and financial activities.

3. As the Sole Manager of the Debtor, I have general knowledge of the Debtor's books and records and am familiar with the Debtor's financial and operational affairs.

4. In order to minimize any adverse effects of the commencement of the chapter 11 case on the Debtor's business operations, the Debtor filed certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek, among other

things, to ensure the continuation of the Debtor's business operations without interruption and to ensure a smooth transition into chapter 11.

5.  I submit this Affidavit to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of the First Day Motions. Except as otherwise indicated, all statements in this Affidavit are based on my personal knowledge, my review of relevant documents, my opinion based on my experience and knowledge of the Debtor's operations and financial condition or information provided to me by other representatives of the Debtor. If I were called upon to testify, I could and would testify competently to each of the facts set forth in this Affidavit.

6.  I am authorized to submit this Affidavit on behalf of the Debtor.

7.  Any capitalized terms not expressly defined herein shall have the meanings set forth in the applicable motion or application.

8.  The Debtor is engaged in the retail golf equipment and related apparel business and currently operates nine (9) retail stores in Georgia, Florida, North Carolina, and Alabama. The Debtor maintains its headquarters in Atlanta, Georgia. The remaining operating store locations are located in: (1) Daphne, Alabama; (2) Aberdeen, North Carolina; (3) Martinez, Georgia; (4) Macon, Georgia; (5) Lake Park, Georgia; (6) Leesburg, Georgia; (7) Panama City Beach, Florida; (8) Destin, Florida; and (9) Ocala, Florida.

### Cash Collateral

9.  State Bank and Trust Company ("State Street") may assert liens and security interests in some or all of the Debtor's inventory (the "Inventory"), as security for a line of credit and a standby-letter of credit pursuant to agreements entered into by the Debtor and The Buckhead Community Bank or February 1, 2008.  As of the Petition Date, the Debtor's

obligations under such line of creditor and stand-by letter of credit are believed to total approximately three million (the "Pre-Petition Indebtedness.").[1]

10.   In addition, Tailor Bilt Golf Inc. ("Tailor Bilt") may assert a lien, junior to that of State Bank on the Debtor's inventory in two of the Debtor's retail locations, and a blanket lien on the Debtor's remaining assets with respect to such two retail locations. Further, Acushnet Company ("Acushnet") may assert a lien may assert a lien, believed to be junior to that of State Bank and/or Tailor Bilt, on certain specific inventory of the Debtor. As the Pre-Petition Indebtedness greatly exceeds the value of the Inventory, the Debtor believes that Tailor Bilt and Acushnet are effectively unsecured creditors, and that any liens they may assert have no value. Nevertheless, State Bank, Tailor Bilt and/or Acushnet may assert that the proceeds received from the Inventory and other assets are "cash collateral" as defined in 11 U.S.C. § 363(a).

11.   The Debtor's use of cash collateral is essential to the continuing operation of its business, to maintain the value of its property and for an effective reorganization. Without the use of the cash in its bank accounts, the Debtor will not be able to pay its employees, purchase additional inventory to generate revenues or pay other ordinary business expenses.

12.   The Debtor does not propose to use cash collateral to pay any amounts due and owing pre-petition, except as outlined by separate motion concerning employee wages and benefits. Because of the fast-paced nature of the Debtor's business, the Debtor must have the use

---

[1] As more fully described in the Emergency Motion for Interim Authority to Use Cash Collateral and Request for Emergency Hearing filed contemporaneously herewith, The Pre-Petition Indebtedness relates back to a line of credit and standby letter of credit originally provided by The Buckhead Community Bank on or about February 1, 2006, and a UCC filed contemporaneously therewith. On or about December 4, 2009, The Buckhead Community Bank was closed by the Georgia Department of Banking and Finance, and the FDIC was appointed as receiver. Immediately thereafter, State Bank acquired certain assets and deposits of The Buckhead Community Bank, including, upon information and belief, The Buckhead Community Bank's interest in all or part of the Pre-Petition Indebtedness. The transition of the assets from The Buckhead Community Bank to State Bank might raise legal issues or potential defenses of which the Debtor is not currently aware, but does not waive.

of cash collateral to meet its ongoing obligations. Delay of even a few days could cripple the Debtor's business and limit its ability to reorganize.

13. The Debtor proposes adequate protection for the use of cash collateral as follows:

(a) State Bank will be given replacement liens in post-petition inventory to the extent and priority they existed as of the Petition Date;

(b) To the extent that the liens of Tailor Bilt or Acushnet are determined to have any value, they will be given replacement liens in post-petition inventory to the same extent and in the same order of priority as existed as of the Petition Date; and

(c) The Debtor will only use cash collateral for items set forth in a budget to be approved by the Court. A proposed budget for use of cash collateral through the date of a further hearing will be filed prior to the hearing on this Emergency Motion.

## Payroll

14. The Debtor employs approximately 44 full and part-time people in its operations. Debtor is obligated under different salary and wage structures, insurance plans and other programs designed to provide benefits for its employees. The continued services of its employees and is vital to Debtor's continuing operations and its ultimate ability to reorganize in this Chapter 11 case.

15. The Debtor pays its employees bi-weekly in arrears. The next payroll is due on January 22, 2010 for the two week period ending Sunday, January 17, 2010. As of the Petition Date, the Debtor owed its employees various sums for (i) wages, salaries, and/or other compensation (ii) reimbursement of employee business expenses and/or (iii) other employee benefits, including, without limitations, those due to or for the benefit of the employees under the

Debtor's health plans and matching funds for the 401(k) retirement plan (collectively "Compensation").

16. In addition to the foregoing, there are existing policies and procedures, consistent with past practices of the Debtor and industry standards generally, regarding employees which constitute, for all intents and purposes, additional compensation and benefits which the Debtor is obligated or desires to maintain. More specifically, these are as follows:

(a) The Debtor provides health insurance to certain of its employees. As of the Petition Date, the Debtor was obligated to make payments for premiums on group health insurance policies relating to the coverage provided as part of the Debtor's normal benefits. In order to maintain normal group coverage for the benefit of those employees, the Debtor must be able to pay all of these premiums.

(b) The Debtor maintains a comprehensive umbrella workers compensation insurance policy for its employees. As of the Petition Date, the Debtor was obligated to make payments for premiums on this policy. In order to maintain coverage required by law, the Debtor must be able to pay these premiums.

(c) To the extent deductions were made from the employees' wages and salaries prior to the Petition Date for voluntary benefits, the Debtor proposes to apply or deliver such deducted sums, which represent property of the employees, for such purposes as wage and salary check-offs and deductions.

17. Gross salary and wages for the January 4 to January 17, 2010 payroll cycle will be approximately $43,318.24. Federal and state withholding tax and other obligations (FICA, FUTA, SUTA) for the period total approximately $7,601.54. Gross salary and wages for the remaining pre-petition portion of the payroll cycle, representing the period from January 18-20,

2010, will be approximately $9,210.79. Federal and state withholding tax and other obligations (FICA, FUTA, SUTA) for that period total approximately $989.93. The Debtor estimates that the total for other employee related expenses and reimbursements, including employer-paid portions of health insurance premiums and 401(k) matching, will total approximately $4,000.00.

18. The Debtor would have paid these amounts in the ordinary course of business but for the filing of the Petition.

19. The Debtor requests that the Court hear this Motion on an emergency basis.

## Cash Management

20. Prior to the commencement of this Chapter 11 case, the Debtor operated its business through and maintained three (3) bank accounts with depository institutions, as follows:

Wachovia Bank, N.A. (now Wells Fargo), account no. 2000026136956
Bank of America, N.A., account no. 003255969075
State Bank and Trust Company (formerly Buckhead Community Bank), account no. 0164773.

21. The accounts at Wachovia and BOA were used for deposits of daily receipts and were swept at regular intervals into the Debtor's main operating account located at State Bank. The State Bank account also receives electronic deposits from credit card processors and all business expenses, including payroll, taxes, vendors, and rent payments are paid from this account.

22. Transition to new debtor-in-possession bank accounts would be disruptive at this critical juncture. The Debtor has a complex electronic cash management system in place that provides excellent controls over cash in and out of the main operating account. Furthermore, the Debtor is a retail business, heavily dependent on credit card payments and with agreements with many credit card processors for electronic deposit of receipts and payment of processing fees. A requirement that the Debtor close the main operating account will disrupt the flow of cash from

credit card receipts, potentially jeopardizing the Debtor's ability to operate. Permitting existing accounts to remain open for a reasonable period of time while arrangements are made for orderly transition of electronic receipts and disbursements to a new account will preserve business continuity and avoid the operational and administrative paralysis that closing the accounts and opening new ones would necessarily entail. As a result, all parties-in-interest, including the Debtor's employees, vendors and customers, will be best served, and the Debtor's estate will benefit considerably.

### Reject Leases

23. The Debtor is party to a total of 19 leases of non-residential real property where it does or once operated retail stores. The Debtor has closed ten (10) of its unprofitable store locations in an effort to reduce costs.

24. Based on its analysis of profitability of stores and in an effort to reduce costs, the Debtor closed its locations in Greenwood, South Carolina; Martinez, Georgia; Columbus, Georgia; DeLand, Florida; Gainesville, Florida; Marietta, Georgia; Foley, Alabama; Lumberton, North Carolina; Pensacola, Florida; and Savannah, Georgia.

25. The Debtor has determined, in the exercise of its business judgment, that the Rejected Leases have no value to the Debtor's estate and that amounts payable under the Rejected Leases are a burden on its estate. Accordingly, the Debtor believes that rejection of the Rejected Leases as requested herein is in the best interest of its estate and creditors.

### Limit Notice

26. The Debtor has over 200 creditors and parties in interest in this case. The costs of copying, postage, and other expenses associated with the mailing of notices as required by the Bankruptcy Code and Rules will be costly and extremely burdensome to the Debtor's estate. In

many instances, the subject matter of pleadings or other notices will not be relevant to parties who would otherwise receive notice and could cause confusion.

27. The proposed Short List for service of all filings and notices would include the main parties in the case, as well as any party whose rights may be affected by a motion or other filing, and any party requesting inclusion on the Short List for receipt of all filings and notices.

28. The Debtor believes that limiting notice in the manner provided in its Motion to Limit Notice will make administration of the case more efficient and cost-effective. Because all creditors and parties in interest will have the right to request notice of all proceedings and to be included on the Short List at any time, the Debtor believes that the notice procedures proposed will not prejudice the rights of any creditor or party in interest.

*Signature on Following Page*

FURTHER, AFFIANT SAYETH NOT.

_____
A. Boyd Simpson

Sworn to before me this
21st day of January, 2010.

_____
Notary Public
My commission expires: 5/20/20 11

*[Notary seal: CHERLYN B. CASKEY, MY COMMISSION EXPIRES MAY 20, 2011, GWINNETT CO., GEORGIA, NOTARY PUBLIC]*